[Crim. No. 29911. Second Dist., Div. Two. Aug. 24, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.
MANUEL RODRIGUEZ FELIX et al., Defendants and Appellants.

**COUNSEL**

Paul Arthur Turner and Richard H. Levin, under appointments by the Court of Appeal, for Defendants and Appellants.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Robert F. Katz and Robert R. Anderson, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

FLEMING, J.—The three-count information charged four defendants with murder of Johnny Santiago, murder of Raul Garcia, and grand theft. Defendants Pedro and Graciela Cuervo are husband and wife; defendant Manuel Felix is their son-in-law; and defendant Agueda Coralia Felix is their daughter. The trial court granted Pedro Cuervo's motion for acquittal and also dismissed the grand theft charge against all defendants. The jury acquitted Graciela Cuervo, convicted Manuel Felix (Manuel) of voluntary manslaughter of Garcia, and convicted Agueda Coralia Felix (Coralia) of voluntary manslaughter of Santiago. Manuel and Coralia present numerous contentions on appeal, but the only one that merits discussion in a published opinion is Coralia's contention that

her confession to Officer Solorzano (first confession) was inadmissible because elicited by playing Manuel's taped confession obtained in violation of *Miranda* rules, and that her later confession to Officer Garcia (second confession) was equally inadmissible as the tainted product of the first.

## FACTS

The victims died of multiple gunshot wounds inflicted at the Cuervo residence by guns belonging to Manuel and Coralia. Conflicting eyewitness accounts by the informant, Abelardo Alejo, by defendant Manuel, and by the younger daughter of the Cuervos, Yolanda Cuervo, tended to show either that the homicides were a planned double execution of the victims because they failed to repay loans from Graciela Cuervo; or that during the parties' discussion of the loans the victims or Manuel initiated an exchange of gunfire that resulted in their deaths. Alejo, an acquaintance of the Cuervos, who like them had previously resided in Cuba, testified that while he was visiting the Cuervos on 10 December 1975, the day of the shootings, the victims (Santiago and Garcia) came to the residence. Pedro, Graciela, and the victims were seated talking at the dining room table, when Manuel said in Spanish words signifying "That's enough" or "that's all right," pulled a pistol from his pocket, loaded it, and fired eight or ten shots toward the dining room area. Manuel then offered the pistol to Alejo so he too could shoot the victims, but Alejo declined the offer. Meanwhile, Coralia, who also had a pistol in her hand, fired twice at Garcia. Someone said that one of the victims was still alive, and Alejo observed that Santiago was moving. Coralia stood in front of Santiago, pointed her arm toward him, and fired one or two more shots. Thereafter, defendants searched the bodies of the victims and removed their car keys. Coralia took a gold chain from Garcia's neck and said, "I'm being paid with this." Alejo helped defendants carry the bodies of the victims to their Lincoln Continental, where Santiago's body was put in the trunk and Garcia's body in the back seat. Manuel and Coralia then drove the vehicle away. Graciela gave Alejo $500 to buy himself a car; Coralia, after her return, gave him a small pistol; the four defendants then took him home and told him to say nothing. That same day Alejo went to the airport and fled to New Jersey.

Police officers found the bodies on 13 December riddled with numerous gunshot wounds.

On the basis of information furnished by Alejo, police obtained a warrant to search the Felix and Cuervo residences. While police officers were taking Manuel and Coralia into custody, others were searching the then unoccupied Cuervo residence. During the search Graciela arrived, and in her purse the officers found a piece of paper with the name Raul Garcia, an address, and a phone number. The search of the Cuervo residence yielded a .38 caliber revolver in a box in the closet; three bullets in the dining room wall behind the wallpaper; and a phone bill showing a call from the Cuervo phone to the number on the paper with Garcia's name on it. Later, the police found $7,500 in cash inside the cushion of a love seat in the living room. Ballistics data established that the .45 caliber automatic weapon taken from Manuel on his arrest fired the .45 caliber bullets recovered from both bodies and from the wall at the Cuervo residence, that the .25 caliber pistol given by Coralia to Alejo fired a bullet removed from Santiago's body.

Manuel testified that Garcia and Santiago had come to the residence and threatened the Cuervos by telling them their names would shortly appear in the obituaries; Santiago pointed a gun at Graciela; and Garcia, indicating Manuel, said "Shoot him first"; Manuel then shot the victims to defend himself and his family. According to Manuel, Alejo searched the bodies, took money and car keys from the bodies, and dissuaded Pedro from calling the police.

Yolanda Cuervo, the younger daughter, testified that after Garcia had been shot the dying man said, "You beat me to it." But Yolanda's foster mother later testified that Yolanda admitted lying on the witness stand and had said her sister Coralia shot one of the victims. A neighbor and friend of the Cuervos, Julia Nunez, testified that when she saw Graciela about a week before the shootings, a "violent" Graciela said Garcia was going to pay what he owed her and was not going to leave the place alive.

Coralia did not take the stand.

### THE CONFESSIONS

On the evening of the arrests, 22 December 1975, Sergeant Solorzano questioned Manuel at the police station and obtained from him incriminating admissions amounting to a confession. The trial court found that this interrogation violated the rules of *Miranda* v. *Arizona*

(1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], in that although Manuel agreed to answer questions, he requested an attorney, yet nevertheless Solorzano proceeded with his interrogation. Solorzano's purpose was to obtain evidence to impeach Manuel should the latter take the stand and deny involvement in the shootings.[1]

Solorzano next interviewed Coralia, who after adequate *Miranda* warnings waived her rights. At first, she denied any involvement in the killings, and when told that Manuel had confessed said it was a lie. Solorzano then played for her excerpts from Manuel's taped confession, after which she herself confessed involvement in the killings. The trial court found that she had waived her right to remain silent, that her confession was voluntary, that it was not the product of any implied promise but the result of having heard Manuel's confession. Yet in spite of this favorable ruling, the prosecution did not offer this confession in evidence. Nevertheless Coralia argues that this ruling in favor of admissibility effectively precluded her from testifying in her own defense, in that if she had taken the stand she would have been confronted with her statement that she "finished killing them because they were still alive."

About an hour and a half after her interview with Solorzano, Coralia confessed a second time to Officer Garcia, then engaged in transporting her to jail. She told him the homicides had come about because the younger victim would not repay his debt to Graciela.[2] Officer Garcia did not question Coralia but merely made noncommittal responses to her volunteered statements. The trial court found this second confession was voluntary, was neither the product of interrogation nor of Manuel's confession, and was also admissible in evidence. This second confession was introduced in evidence against Coralia.

---

[1] Such use of inadmissible confession was then permissible under both California (*People* v. *Nudd* (1974) 12 Cal.3d 204 [115 Cal.Rptr. 372, 524 P.2d 844]) and federal law (*Harris* v. *New York* (1971) 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643]). California law was subsequently changed to disapprove such use (*People* v. *Disbrow* (1976) 16 Cal.3d 101 [127 Cal.Rptr. 360, 545 P.2d 272]).

[2] " 'Had the young Mexican given my mother the $8,000 that he owed her, this never would have happened. The young Mexican had only offered to pay my mother $2,000 of the $8,000 owed to her. The young Mexican then got mad because my mother requested the full amount and we started arguing. The younger Mexican got upset and threatened to kill my mother. At this time my husband and I,' that being Manuel Felix, 'shot both young Mexican and the older fellow. After we shot them we found that the young Mexican did in fact have $8,000 on him. Later in the day my husband and I placed the bodies', that being the young Mexican, 'in the trunk of the car and the body of the older man in the back seat and my husband drove the car to the 5200 block of Clara.' "

## Discussion

█ In our view both Coralia's confessions were admissible in evidence, a view that makes it unnecessary to discuss prejudice to Coralia as a result of the court's ruling in favor of the admissibility of the first confession or to discuss Coralia's argument that her second confession was the tainted offspring of the first. ██ Both confessions were admissible because a defendant has no standing to suppress evidence against her by asserting a violation of the Fifth Amendment rights of another. (*People* v. *Varnum* (1967) 66 Cal.2d 808, 812 [59 Cal.Rptr. 108, 427 P.2d 772]; *In re Eugene M.* (1976) 55 Cal.App.3d 650, 657 [127 Cal.Rptr. 851]; see also *Byrd* v. *Comstock* (9th Cir. 1970) 430 F.2d 937, 938.) Fifth Amendment violations, which only the aggrieved party may challenge, are differentiated from Fourth Amendment violations, which any affected party may challenge, because there is nothing inherently unlawful about noncoercive questioning that merely contravenes the procedural rules set out in *Miranda,* hence no compelling reason exists to exclude such evidence when the person whose right has been violated is someone other than defendant. (*People* v. *Varnum, supra; Michigan* v. *Tucker* (1974) 417 U.S. 433, 448-449, 451-452 [41 L.Ed.2d 182, 195-197, 94 S.Ct. 2357].) █ By contrast, the exclusionary rule under the Fourth Amendment is directly designed to deter illegal police conduct, a design it is thought would be frustrated by imposition of technical rules in respect to standing (see *People* v. *Johnson* (1969) 70 Cal.2d 541, 552-553 [75 Cal.Rptr. 401, 450 P.2d 865, 43 A.L.R.3d 366]; *People* v. *De Vaughn* (1977) 18 Cal.3d 889 [135 Cal.Rptr. 786, 558 P.2d 872]).

█ The issue remains whether the questioning at bench can properly be considered noncoercive. No showing was made that Manuel's confession was the product of coercion and therefore unreliable, or that coercive tactics were used on Coralia. █ But is use of subterfuge in itself a form of coercion? The cases indicate the contrary. Not only is the practice of confronting a suspect with the confession of an accomplice approved (*People* v. *Long* (1970) 6 Cal.App.3d 741, 748 [86 Cal.Rptr. 227]; *People* v. *Lantz* (1968) 265 Cal.App.2d 5, 8, fn. 4 [71 Cal.Rptr. 188]; *People* v. *Robinson* (1969) 274 Cal.App.2d 514, 520-521 [79 Cal.Rptr. 213]), but it is even permissible to pretend an accomplice has confessed in order to persuade the suspect to confess. (*Frazier* v. *Cupp* (1969) 394 U.S. 731, 739 [22 L.Ed.2d 684, 693, 89 S.Ct. 1420]; *Commonwealth* v. *Jones* (1974) 457 Pa. 423 [322 A.2d 119]; *State* v. *Palko* (1936) 121 Conn. 669 [186 A. 657] [affirming second appeal on different grounds see *Palko* v. *Connecticut* (1937) 302 U.S. 319 (82 L.Ed 288, 58

S.Ct. 149)]; Annot., 99 A.L.R.2d 772 (1965) 794 *ff.*, § 10.) The limits on the use of subterfuge in interrogation are defined by the potentiality of the subterfuge to produce an untrue statement. (See *People* v. *Atchley* (1959) 53 Cal.2d 160, 171 [346 P.2d 764], accord *Procunier* v. *Atchley* (1971) 400 U.S. 446, 454 [27 L.Ed.2d 524, 531, 91 S.Ct. 485] [suspect questioned by insurance broker, also a police officer, and conversation secretly taped]; *People* v. *Connelly* (1925) 195 Cal. 584, 597 [234 P. 374] [suspect told fingerprints were on cash register]; *People* v. *Castello* (1924) 194 Cal. 595, 602 [229 P. 855] [suspect told there were eyewitnesses to theft]; *In re Walker* (1974) 10 Cal.3d 764, 777 [112 Cal.Rptr. 177, 518 P.2d 1129] [en route to hospital, suspect told he might not live and the smart thing to do was talk]; *People* v. *Arguello* (1967) 65 Cal.2d 768, 775 [56 Cal.Rptr. 274, 423 P.2d 202] [suspect induced by stratagem to tie a knot]; *People* v. *Watkins* (1970) 6 Cal.App.3d 119, 125 [85 Cal.Rptr. 621] [suspect told his fingerprints were on getaway car].) The general rule throughout the country is that a confession obtained through use of subterfuge is admissible, as long as the subterfuge used is not one likely to produce an untrue statement. (See Annot., 99 A.L.R.2d 772, 777 (1965).) The presentation to Coralia of Manuel's confession, a confession neither coerced nor unreliable, amounted to subterfuge only to the extent that it may have suggested to Coralia that the confession was admissible in evidence for all purposes, a subterfuge of far lesser order than those sanctioned in the aforementioned cases. Officer Solorzano offered no promises or inducements in his interrogation of Coralia, and the fact that she may have been motivated to confess by her mistaken belief that Manuel had legally incriminated himself, does not invalidate her own voluntary confession. Because her first confession was valid, so necessarily was her second. (*People* v. *Steger* (1976) 16 Cal.3d 539, 550 [128 Cal.Rptr. 161, 546 P.2d 665].)

Other contentions on appeal are insubstantial and do not merit discussion in a published opinion.

The judgments are affirmed.

Roth, P. J., and Beach, J., concurred.