[Crim. No. 31295. Second Dist., Div. Four. Sept. 18, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
ERNEST GORDON et al., Defendants and Appellants.

916

## COUNSEL

Richard H. Levin and Paul Arthur Turner, under appointments by the Court of Appeal, for Defendants and Appellants.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Jeffrey A. Joseph, A. Wells Petersen and Steven V. Adler, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**JEFFERSON (Bernard), J.**—By an amended information defendants Gordon and Boone were charged in count I with burglary, a violation of Penal Code section 459. It was further alleged that defendants intended to and did inflict great bodily injury upon Cheryl, a victim of the burglary, and that defendants used a firearm, a pistol, within the meaning of Penal Code section 12022.5, during the commission of the offense.

In count II defendants were charged with robbery in violation of Penal Code section 211. Great bodily injury and firearm-use allegations were included.

Defendants were charged in count III with the forcible oral copulation of Cheryl, a violation of Penal Code section 288a. It was further alleged that defendants acted in concert while committing this offense.

In count IV, defendants were charged with the rape of Cheryl, a violation of Penal Code section 261, subdivisions 2 and 3. Firearm-use and acting-in-concert allegations were included.

In count V, defendants were charged with forcibly sodomizing Cheryl, a violation of Penal Code section 286, subdivision (d). It was also alleged that defendants acted in concert.

In count VI, defendants were charged with another act of rape of Cheryl, a violation of Penal Code section 261, subdivisions 2 and 3. It was also alleged that defendants acted in concert and used a firearm.

Defendant Gordon was charged with four prior felony convictions while defendant Boone was charged with two such prior convictions. The firearm-use allegations were stricken with respect to defendant Boone.

Defendants entered pleas of not guilty and denied the priors. Defendants' motions, made pursuant to Penal Code sections 995 and 1538.5, were denied. Subsequently, defendants admitted their prior convictions.

Trial was by jury. The jury found defendants guilty as charged, but determined that the firearm-use allegation made against defendant Gordon was not true. Defendants were sentenced to state prison for the term prescribed by law. The sentences were ordered to run consecutively to each other, except that the sentence for the burglary offense was stayed pending completion of the sentence for the robbery offense. After completion of the robbery sentence, the stay was to become permanent. The sentences were ordered enhanced by reason of the great bodily injury infliction, the acts committed in concert, and the prior felony convictions admitted by the defendants.

Defendants have appealed from the judgments of conviction.

I

*The Factual Background*

Upon this appeal, no challenge is directed to the sufficiency of the evidence to support the judgments of conviction. Accordingly, our factual summary concerning the crimes will be brief.

Toward midnight on September 10, 1976, a young married couple, Lewis Steven and Cheryl, returned to their Los Angeles home. Upon entering, Lewis, known to family and friends as Steve, encountered a male who pointed a gun at him. Steve was then hit on the head. He fell

to the floor, and was turned over on his face. His glasses were removed and a paper bag placed over his head; his hands and ankles were taped.

A male, whose face was partially covered by a bandana, entered the bathroom where Cheryl was, and told her to be "cool." Later, someone entered the bathroom and placed a bag over Cheryl's head. She was then led upstairs.

Addressing him as "Steve," the intruders asked the male victim "[w]here is the dope?" Steve could hear voices, and the sound of items being moved around; he heard conversation, which sounded like ghetto talk.

Meanwhile, someone entered the bedroom where Cheryl had been put, and disrobed her. She was forced to orally copulate this individual, and then was raped and sodomized. Later she was raped again. She heard various voices. Steve heard the assailants depart, three of them he thought.

A Los Angeles police officer responded to the call from Lewis and Cheryl. He recovered a laundry ticket with the name "E. Gordon" written upon it, pushed down between the mattress and the bed frame in the bedroom where Cheryl had been assaulted. The ticket had been issued by Poppy Cleaners in Altadena on September 9, 1976.

On September 11, 1976, Investigating Officer Westbrook went to the Poppy Cleaners, and discovered that the clothing to which the ticket pertained had already been picked up that day. Westbrook located this clothing at the home of defendant Gordon, who was arrested the night of September 11, 1976. Two other individuals were taken into custody as the investigation progressed—Richard Dodd and codefendant Boone. At trial, Lewis and Cheryl recognized codefendant Boone as a person who had visited their home socially in June 1976.

## II

### *The Suppression-of-evidence Motion*

Defendants contend on this appeal that their motion to suppress evidence should have been granted, because the custodial interrogation

of defendant Gordon was unlawfully conducted, and led ultimately to the issuance of search warrants, the searches and seizures of physical evidence, and the arrest of Dodd and defendant Boone. Various grounds of illegality are set forth in defendant Gordon's brief, and are adopted by codefendant Boone. ■ Preliminarily, we note that codefendant Boone has standing to attack the finding of the *voluntariness* of defendant Gordon's in-custody admissions, but lacks standing to assert a violation of Gordon's *Miranda* rights. (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]; *People* v. *Varnum* (1967) 66 Cal.2d 808 [59 Cal.Rptr. 108, 427 P.2d 772]; *People* v. *Felix* (1977) 72 Cal.App.3d 879 [139 Cal.Rptr. 366].)

Evidence adduced at the suppression hearing revealed that, after defendant Gordon was taken into custody, he spoke to Detective Ramirez, who advised him of his constitutional rights with respect to custodial interrogation; included, of course, was the right to remain silent. *(Miranda* v. *Arizona, supra.)* Defendant Gordon was asked to take a lie detector test, a request he refused. Defendant Gordon was placed in a lineup on September 13, 1976, but was not identified by either Lewis or Cheryl. The police meanwhile were searching their files in an effort to learn more about defendant Gordon. They discovered that Gordon had previously been associated in criminal activity with a certain Richard Dodd, among others. Defendant Gordon had placed a telephone call to Richard Dodd from the jail. However, because of the lack of identification by the victims, the police planned to release Gordon from custody on September 15, 1976.

On that date, Frank Marino, Gordon's parole officer, placed a detention hold on defendant Gordon, and thus Gordon remained in custody. Marino confronted Gordon with the laundry ticket; Gordon denied complicity in the crime. Marino asked Gordon to submit to a polygraph or lie detector test; Gordon again refused, stating that the public defender had told him he need not take the test.

Marino explained to defendant Gordon that the Adult Authority might wonder, when considering whether or not to revoke Gordon's parole, why he had refused to take the test. Gordon, Marino stated, would be released from custody if he took and passed the lie detector test. Marino also assured Gordon that statements made by Gordon while taking the test, as well as the test results, would not be made available to the Los Angeles Police Department in connection with the current investigation. Defendant Gordon then agreed to take the test.

The lie detector test was administered to Gordon on September 17, 1976, by Sergeant Millard, a deputy sheriff, at his facility, with Marino close at hand. Millard explained to Gordon that he was not going to inform him of his *Miranda* rights purposefully, so that nothing that was said could later be used against Gordon. On the basis of the test, Millard formed the opinion that defendant Gordon had some knowledge of the offenses committed against the victims. This opinion was relayed to Gordon and then to Parole Officer Marino, as was Millard's feeling, expressed to Marino, that it would be fruitful for Marino to immediately commence interrogation of defendant Gordon.

Marino then interrogated Gordon and learned that Gordon had been with Richard Dodd on the day of the crime; Gordon told Marino that he had given Dodd the laundry ticket that bore Gordon's name. Gordon further stated that he knew generally that a crime was being planned; that he knew some of the people involved; that he knew that a series of robberies were being planned by a "white guy." However, he continued to deny participation in the crime committed on September 10, but gave Richard Dodd's name and telephone number to Parole Officer Marino. Armed with this information, Marino contacted the Los Angeles Police Department and the investigation was renewed of the crimes committed against Lewis and Cheryl. This information was contained in the affidavits offered in support of the issuance of search warrants directed to the residences of Richard Dodd, his common law wife, Christina De La Cruz, and codefendant Boone.

On September 23, the police arrived at the apartment complex where Rennee Jones, a sister of Richard Dodd, lived in one apartment and Richard Dodd and his mother lived in another. The police searched Richard Dodd's apartment and found nothing. Then, with Rennee's consent, they searched her apartment and found a coat and some scales, both items identified subsequently as taken from the victims' home. At Christina De La Cruz' home the police discovered a clock, which Christina stated had been given to her by defendant Gordon and which was an item belonging to the victims. Finally, the subsequent search of codefendant Boone's home turned up the Pioneer tape cassette player stolen from the home of the victims, as well as a bandana similar to the one worn by the individual who first confronted Cheryl on the evening of September 10.

Other evidence was provided at the suppression hearing by Rennee Jones, the sister of Richard Dodd. She testified that she had seen defendant Gordon and codefendant Boone together in Boone's automobile on September 10, shortly before the crime. Gordon had come to her apartment on this occasion looking for Richard Dodd, her brother.

Rennee also testified that on September 11, Gordon had again visited her, and had left a coat and some scales in her apartment. Thereafter, she had received several telephone calls from Gordon while he was in custody; Gordon was attempting to locate Dodd, because he wanted Dodd to provide him with an alibi for the night of September 10. Renee said that defendant Gordon became very abusive when she refused to convey his messages to Dodd, and threatened to implicate Dodd in the crime.

Defendant Gordon seeks to establish the illegality of the custodial interrogation upon several distinct grounds.

A. *The Arraignment—The Effect of the Parole Detention Hold*

Defendant Gordon, a parolee, contends that he was not arraigned on the new charges within the time mandated by Penal Code section 825. Gordon was arrested on September 11, 1976, but the record discloses that he did not appear for arraignment until November 30, 1976. The issue of speedy arraignment was raised in the trial court by a motion made pursuant to Penal Code section 995, and thus has been preserved for our consideration here. (*In re Sandel* (1966) 64 Cal.2d 412, 413, fn. 1 [50 Cal.Rptr. 462, 412 P.2d 806].)

Section 825 provides, in pertinent part, that "[t]he defendant must *in all cases* be taken before the magistrate without unnecessary delay, and, in any event, within two days after his arrest, excluding Sundays and holidays; provided, however, that when the two days prescribed herein expire at a time when the court in which the magistrate is sitting is not in session, such time shall be extended to include the duration of the next regular court session on the judicial day immediately following." (Italics added.) Section 1381 of the Penal Code provides that a defendant in custody who is charged with another offense may, by appropriate notice to the district attorney, require that trial for the new offense charged be commenced within 90 days.

The People contend that, since defendant Gordon was on parole at the time he was arrested for this offense, Penal Code section 825 does not apply to him at all, but that section 1381, dealing with individuals in custody, applies. The rationale is that, traditionally, an individual on parole has been regarded as still within the constructive custody of the state. (*People* v. *Goss* (1961) 193 Cal.App.2d 720 [14 Cal.Rptr. 569]; *In re Mugica* (1968) 69 Cal.2d 516 [72 Cal.Rptr. 645, 446 P.2d 525].)

However, in *In re Martinez* (1970) 1 Cal.3d 641, 647 [83 Cal.Rptr. 382, 463 P.2d 734], the California Supreme Court stated that ". . . the defendant's parole status, of course, did not permit the police to interrogate the defendant in connection with the suspected criminal activity without first apprising him of his constitutional rights. . . ," and disapproved *Goss* insofar as it held to the contrary. (*Id.,* at p. 647, fn. 5.) ■ And in *People* v. *Hughes* (1974) 38 Cal.App.3d 670, 674 [113 Cal.Rptr. 508], the same court which had decided *Goss* rejected its reasoning, holding that Penal Code section 825 was applicable to parolees.

We regard *Hughes* as persuasive authority; that decision pointed out that "recent developments in the law of parole" have expanded the constitutional rights of parolees. (See *Morrissey* v. *Brewer* (1972) 408 U.S. 471 [33 L.Ed.2d 484, 92 S.Ct. 2593]; *People* v. *Vickers* (1972) 8 Cal.3d 451 [105 Cal.Rptr. 305, 503 P.2d 1313].)

Nevertheless, we find no violation of Penal Code section 825 in the instant case. Defendant Gordon was arrested in the early evening hours of September 11, 1976, a Saturday. By statute, Sunday was excludable in computing the two days, the outside limit for arraignment. The time mandated by statute for arraignment on the present criminal charges expired toward evening on Tuesday, September 14, 1976, at a time, we assume, that court was not in session; therefore, the authorities had until the end of Wednesday, September 15, 1976, to bring defendant Gordon before a magistrate and charge him with an offense, or to release him.

The record below indicates that defendant Gordon would have been released by the police on September 15, 1976, if his parole officer, Marino, had not placed a parole detention "hold" on him on that date.

We consider next the relationship between the parole detention hold and the mandatory period for arraignment. Parole officers' right to detain

parolees is set forth in Penal Code sections 3056 and 3060. A detention hold may be placed on a parolee for any number of reasons, including the initiation of new criminal charges. We conclude that when Marino placed the detention hold on defendant Gordon, he was no longer being detained *prior to arraignment,* and Penal Code section 825 ceased to operate. Defendant Gordon was now being held in connection with his status as a prisoner—constructive or actual—of the Adult Authority.

Our record, however, does not reveal that any official action was taken with respect to defendant Gordon during the weeks spent in jail from the date of the parole detention hold to the date of arraignment finally on the new charges. ■ The case of *Morrissey* v. *Brewer, supra,* tells us that a parolee is constitutionally entitled to a preliminary hearing, however informal, on his status as a parolee; "some minimal inquiry . . . at or reasonably near the place of the alleged parole violation or arrest and as promptly as [is] convenient after arrest while information is fresh and sources are available. . . ." (*Morrissey* v. *Brewer, supra,* 408 U.S. 471, 485 [33 L.Ed.2d 484, 496].)

Such preliminary hearing or inquiry was required in the case at bench to justify defendant Gordon's custodial status during the period in which he awaited either arraignment on new charges or a more formal hearing concerning parole revocation.

But it was still incumbent on defendant Gordon to show that the illegal basis of his detention was prejudicial to him at his ultimate trial. (*People* v. *Hill* (1967) 66 Cal.2d 536 [58 Cal.Rptr. 340, 426 P.2d 908].) We find that the investigation and interrogation of Gordon by Parole Officer Marino, *in and of itself,* in the days *immediately* following the parole detention hold, was not violative of either *Morrissey* v. *Brewer, supra,* or *People* v. *Vickers, supra.* ■ It was the extended detention without preliminary hearing or inquiry which was illegal; defendant was not formally arraigned until the end of November 1976 on the new charges.

B. *The Voluntariness of the Statements*

Defendants contend that the evidence below establishes, as a matter of law, that the information received from Gordon by Parole Officer Marino was the result of threats and inducements by Marino, and, hence, was involuntarily obtained. The trial court found that the evidence in this

regard was uncontradicted, but that the statements made were voluntary rather than coerced. We disagree.

■ " 'As a reviewing court it is our duty to examine the uncontradicted facts to determine independently whether the trial court's conclusion of voluntariness was properly found. . . . In exercising this function the court recognizes that the burden is on the prosecution to show that a confession was voluntarily given without previous inducement, intimidation or threat. . . .' [Citation.] Thus in making an independent examination of the record to ascertain whether defendant's statements were voluntary we follow a practice of the United States Supreme Court which is both well established . . . and currently adhered to. [Citations.]" (*People* v. *Sanchez* (1969) 70 Cal.2d 562, 571-572 [75 Cal.Rptr. 642, 451 P.2d 74]. Fn. omitted.) "With respect to conflicting testimony, of course, '. . . we accept that version of events which is most favorable to the People, to the extent that it is supported by the record.' " (*People* v. *Jimenez* (1978) 21 Cal.3d 595, 609 [147 Cal.Rptr. 172, 580 P.2d 672].) And in *People* v. *Trout* (1960) 54 Cal.2d 576, 583 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418], we find the teaching that "any form of compulsion or promise of reward" taints the information which is forthcoming as a result. "Involuntary admissions are also inadmissible [citations] and 'the due process clause of the Fourteenth Amendment requires exclusion of coerced admissions if they are sufficiently damaging. [Citations.]' " (*People* v. *Haydel* (1974) 12 Cal.3d 190, 197 [115 Cal.Rptr. 394, 524 P.2d 866].) ■ The fruits of involuntary admissions are as inadmissible as the admissions themselves. (See *Haydel, supra,* 12 Cal.3d 190, 201.)

In the case at bench, the trial court, because of the lack of *Miranda* warnings and because of the promise made to defendant Gordon by Parole Officer Marino and Deputy Sheriff Millard concerning the lack of access the Los Angeles Police Department would have to any of his statements, precluded use of the statements at trial.

In addition, in weighing the sufficiency of the affidavits supporting the search warrants, the trial court excised therefrom the information acquired by Marino and passed on to the police. The trial court held that the affidavits were sufficient without the excised material. The only information not so excised was Dodd's name and telephone number. In not excising this information, the trial court relied upon the theory that the taint, if any, attached to the information acquired from defendant

Gordon by Marino, had been attenuated by the time the police made use of Dodd's name and telephone number. Defendants, however, contend that it was the use of this particular piece of information which led to the issuance of the search warrants and to the discovery of the physical evidence which incriminated them.

■ It is clear from the record that Parole Officer Marino used his power to either *hold*—or *release*—defendant as a pressuring device to elicit information from his parolee. The police officers with whom Marino was in contact were less than enthusiastic about his project, for they were undoubtedly aware that Marino was subjecting himself to the charge of coercion. Notably, Investigator Westbrook refused to assist Marino in the conducting of the polygraph test. He refused to supply Marino with a picture of the victim, Cheryl. Use of the polygraph may be condoned by the Adult Authority, but it is not regarded as a scientifically accepted reliable source of information by the courts. (*People* v. *Carter* (1957) 48 Cal.2d 737 [312 P.2d 665]; *People* v. *Adams* (1975) 53 Cal.App.3d 109 [125 Cal.Rptr. 518].) The unfortunate situation was compounded by the uncertainty surrounding defendant's arraignment or release. The totality of circumstances leads us to the conclusion that the prosecution did not sustain its burden of proving that defendant Gordon's statements to Marino were an exercise of free will on his part. In *People* v. *Jimenez, supra,* our high court determined that the burden on the prosecution to prove a defendant's confession to be voluntary must be sustained by proof beyond a reasonable doubt.

■ In considering the admissibility of the physical evidence ultimately gathered by the searches made pursuant to warrants, the question is " 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " (*Wong Sun* v. *United States* (1963) 371 U.S. 471, 488 [9 L.Ed.2d 441, 455, 83 S.Ct. 407].)

The burden of proof is on the prosecution, once the initial illegality has been established, to show that the taint has been attenuated (*People* v. *Aylwin* (1973) 31 Cal.App.3d 826 [107 Cal.Rptr. 824]) and one means of meeting that burden is to establish that the information so obtained would have been discovered by the police anyway, during the normal course of a lawfully conducted investigation. (*Lockridge* v. *Superior Court*

(1970) 3 Cal.3d 166 [89 Cal.Rptr. 731, 474 P.2d 683].) Evidence subject to "inevitable discovery" or stumbled upon by the police by "pure happenstance" is held admissible, regardless of the initial manner of discovery. (*Aylwin, supra.*)

The People argue that the record establishes that the police had already settled upon Dodd as a likely suspect before Gordon was given the polygraph test, and that it would only have been a question of time before the police located Dodd. It is also urged that it was "pure happenstance" that the police encountered Rennee Jones while they were executing the Dodd search warrant, and that she consented to the search of her apartment. So the trial court found.

In applying the "inevitable discovery" doctrine, the trial judge stated: "Now, whether or not they [the police] would have gotten Dodd's address and telephone number, whether it was simply a question of time we can speculate."

"Speculation" involves a process far removed from a reasonable determination of whether the prosecution has met its burden of establishing the attenuation of taint from illegally obtained evidence. It is the latter duty which the trial courts must undertake.[1] The record establishes that at the time Marino placed the parole detention hold on the defendant Gordon, the police were preparing to *release* him. The overwhelming inference from this fact is that discovery of Dodd's location was considered less than urgent by the police, if on their list of priorities at all, at the time Marino acted. Preliminary inquiry about a suspect does not render location of him "inevitable." The record is devoid of affirmative evidence showing that the police were planning to continue to investigate Dodd despite Gordon's release. We conclude that the prosecution did not carry its burden of proof on this issue and, hence, that the trial court erred in allowing the issue of the sufficiency of the search warrant affidavits to be determined with the inclusion of the reference to Dodd.

Since the suppression-of-evidence motion should have been granted, the judgments of conviction must be reversed. Since we are reversing the

---

[1] We need not, in view of our holding, discuss the issue as to the burden-of-proof standard required to support a determination in favor of inevitability, i.e., whether by a preponderance of the evidence or "clear and convincing" evidence. (See *People* v. *Martin* (1970) 2 Cal.3d 822, 835 [87 Cal.Rptr. 709, 471 P.2d 29].)

judgments of conviction, we need not discuss other contentions raised by the defendants which may or may not arise in the event of a second trial.

The judgments are reversed.

Kingsley, Acting P. J., and Jones, J.,* concurred.

On October 12, 1978, the opinion was modified to read as printed above. Respondent's petition for a hearing by the Supreme Court was denied November 15, 1978. Clark, J., Richardson, J., and Manuel, J., were of the opinion that the petition should be granted.

*Assigned by the Chairperson of the Judicial Council.