[No. A032098. First Dist., Div. Two. June 12, 1987.]

In re J. CLYDE K. et al., Persons Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
J. CLYDE K. et al., Defendants and Appellants.

712

**COUNSEL**

Benjamin R. Winslow and Paula Schmidt, under appointments by the Court of Appeal, for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Ronald E. Niver and Josanna Berkow, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

ROUSE, Acting P. J.—This case is illustrative of an oft-heard proposition: Confession is not only good for the soul (an old Scottish proverb) but it often gets the wrongdoer "off the hook." Here, two minors complain that a confession which caused them to become wards of the juvenile court was involuntarily coerced. We conclude that existing statutory and case law support their position and accordingly reverse the orders of the juvenile court.

On March 8, 1985, petitions were filed in the superior court charging defendants J. Clyde K. (Clyde) and Tommy C. (Tommy) with burglary (Pen. Code, § 459), petty theft (Pen. Code § 488) and receiving stolen property (Pen. Code § 496, subd. 1). Defendants were alleged to be minors within the meaning of Welfare and Institutions Code section 602. Each defendant denied the allegations of the petition.

Defendants filed motions to suppress evidence which were heard on June 14 and 17, 1985, and denied on June 17, 1985. The allegations of count three, receiving stolen property, were found true and the allegations of counts one and two, burglary and petty theft, were found untrue.

Defendants were adjudged wards of the juvenile court on July 5, 1985, and placed on probation. They were ordered to attend school regularly when in session, perform community service and pay certain fines.

Notices of appeal were filed by both defendants.[1]

*Statement of Facts*

On March 5, 1985, the singer Prince gave a concert at the Cow Palace near San Francisco. The San Francisco Police Department's Patrol Bureau Task Force was assigned to the area around the concert. Their function was to patrol areas of anticipated trouble and abate robberies and burglaries. An average of four to five robberies and one to two auto burglaries are regularly committed in the Cow Palace area each night.

Bruce Marovich, an 18-year veteran of the San Francisco Police Department and an officer in the Patrol Bureau Task Force, observed 3 juveniles

---

[1] Clyde and Tommy both state in their notices of appeal that they are appealing from the denial of their motions to suppress evidence, orders which are nonappealable but reviewable on appeal from the dispositional orders subsequently entered. Under the modern rule favoring the saving of appeals by construction, we will treat both notices of appeal as referring to the dispositional orders declaring Clyde and Tommy wards of the court. (See 9 Witkin Cal. Procedure (3d ed. 1985) Appeal, § 375, pp. 377-380, § 412, pp. 410-411.)

riding their bicycles in the Cow Palace area near Argonaut and Velasco Streets around 8 p.m. that evening. He observed the boys circling up and down the street and peering into unattended parked vehicles. One boy came to the corner, apparently to serve as a lookout while the other two looked inside the cars. Officer Marovich was able to observe the boys for a five-minute period. During this period he did not see the boys actually try to open a car. However, Officer Marovich suspected the boys of "auto boosting." He tried to keep them under surveillance, but lost sight of the boys when they rode their bicycles between some buildings.

Officer Marovich continued patrolling the area. Approximately an hour later he saw the same three boys crossing Velasco north of Schwerin, balancing large boxes (three feet long by ten inches wide) on the handlebars of their bicycles. Tommy had one box; Clyde and the third boy, Raymond, each carried two boxes. The boys rode through a park and headed northeast towards a housing complex. Officer Marovich could not determine what the boxes contained; however, he stopped the boys as they came out of the park on Kelloch. Officer Marovich looked at the boxes and saw a picture of a coatrack on each of them. He and his partner grabbed the juveniles by the wrists and asked them where they had gotten the boxes. Clyde replied that a man around the corner had given them the boxes. The others seemed to agree. The three boys were then handcuffed.

In an effort to determine the veracity of the boys' statement, Officer Marovich "separated them like witnesses." Clyde was advised of his *Miranda* rights. (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed. 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].) Then, in what must have been a momentary venting of his parental instinct, Officer Marovich told Clyde that if he told him the truth, the worst he would get would be a citation, but if he found out that Clyde had lied to him, he would be arrested if there was proof the boxes were stolen. Officer Marovich asked Clyde to show him where the man had allegedly given them the boxes. The other two boys remained with Marovich's partner, Sergeant Currie, and two other officers in a marked police vehicle. Clyde led Marovich 12 blocks away behind some apartments and showed him a garage by a very small park where he claimed the man had given them the boxes.

Before returning to the site of the stop, Officer Marovich decided on his own initiative to investigate whether any business in the area had been burglarized. With Clyde still in the car, the officer stopped at an electric company and showed a man there one of the boxes containing a coatrack. Marovich asked him whether it belonged to anyone at the electric company and the man told him it did not.

To check Clyde's story, Officer Marovich next took Tommy aside and advised him of his rights. Tommy also said that a man had given them the boxes. Marovich then took Tommy for a ride so that he could indicate where this occurred. Tommy directed the officer two blocks further and up a different street than Clyde had done earlier. He said that the man who had given him the boxes was parked in front of stairs that went up a hill. According to Officer Marovich, "at this time I knew there was a definite discrepancy and they were both lying."

Officer Marovich returned Tommy to the site of the stop and took the third boy, Raymond, aside. He advised Raymond of his rights and told him the other boys had lied about the boxes. Marovich told Raymond that if he told the truth he would get a citation, but if he lied he would be booked. Raymond went out with the officers and then returned to the site of the stop. All three boys, still handcuffed, were then placed in the back of the police car. Officer Marovich again repeated his statement that if the boys told the truth they would get a citation, but if they lied they would go to jail. Raymond waited about five seconds and then said, "Forget that. I can't go back to jail." He began pounding on the door of the police vehicle, and Officer Marovich came over to the car. Raymond was advised of his *Miranda* rights. Raymond then told Officer Marovich that the boxes were stolen and that the boys had taken them from a warehouse on Bayshore Boulevard. Raymond showed the police the loading dock from which they were taken. The officers spoke with Daniel Cheng, the general manager of the company which owned the warehouse. Mr. Cheng identified the boxes, indicating they had been stolen from his warehouse.

Officer Marovich kept his promise. Raymond was given a citation and then released. Officer Marovich asked Tommy and Clyde if Raymond could take their bicycles home for them. They became distraught and said they would tell him the truth if he would give them a citation and let them go home. Officer Marovich told them it was too late.

Tommy and Clyde were driven to the police station, fingerprinted, photographed and taken to Youth Guidance Center. At the police station, Tommy made an inculpatory statement. Both Tommy and Clyde made inculpatory statements to their parole officers the next day.

I.

Each minor contends that Raymond's confession was the product of coercion, resulting from the repeated statements by Officer Marovich that if he told the truth he would receive a citation, but if he lied he would be

taken to jail. Each claims that under such circumstances the confession and fruits gathered as a result were inadmissible.

We conclude that the minors may seek exclusion of the confession and tainted fruits on the basis of an involuntary confession by another. Further, we find that Raymond's confession was not voluntarily made. Instead, it resulted from a police officer's threat to jail the boy if he did not talk and the officer's promise to release him if he did. The motion for suppression of evidence premised upon the involuntary nature of the confession should have been granted. Failure to do so requires that the judgment finding the minors wards of the court pursuant to Welfare and Institutions Code section 602 be reversed.

## II.

### *Standing to Challenge Voluntariness of Confession*

On appeal, the minors contend that Raymond's confession was unlawfully obtained through improper police tactics, hence they seek to suppress Raymond's confession and the fruits thereof.

Tommy and Clyde rely upon California law which recognizes the right of a defendant to seek exclusion of a third party's confession obtained by coercive police tactics, as well as the right to suppress physical and other nonhearsay evidence acquired as a result of the confession. (*People* v. *Varnum* (1967) 66 Cal.2d 808, 813 [59 Cal.Rptr. 108, 427 P.2d 772]; *People* v. *Gordon* (1978) 84 Cal.App.3d 913, 919 [149 Cal.Rptr. 91]; accord *People* v. *Enriquez* (1982) 132 Cal.App.3d 784, 792-793 [183 Cal.Rptr. 447]; *In re Jessie L.* (1982) 131 Cal.App.3d 202, 209 [182 Cal.Rptr. 396]; *People* v. *Jones* (1980) 105 Cal.App.3d 572, 581 [164 Cal.Rptr. 605]; *People* v. *Felix* (1977) 72 Cal.App.3d 879, 885 [139 Cal.Rptr. 366].)

However, the case law relied upon by defendants predates the adoption of article I, section 28, subdivision (d), of the California Constitution (hereafter section 28(d)). Added by Proposition 8 in 1982, section 28(d) provides in relevant part: "Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding, including ... any trial or hearing of a juvenile court for a criminal offense, whether heard in juvenile or adult court. Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay ...."

Thus, the question presented on this appeal is whether the rule permitting a defendant to attack the voluntariness of another's confession as

the product of police coercion survives the adoption of section 28(d). This appears to be a case of first impression wherein, after careful review of the relevant authorities, we conclude that section 28(d) did not nullify the law which permits a defendant to attack another's coerced confession and to exclude the confession and evidence gathered as a result thereof.

Section 28(d) expressly excludes from its coverage statutory rules of evidence relating to privilege and hearsay. Pursuant to this "savings clause," the California Supreme Court has held that use immunities adopted by pre-Proposition 8 decisions survived the passage of section 28(d). In *Ramona R. v. Superior Court* (1985) 37 Cal.3d 802 [210 Cal.Rptr. 204, 693 P.2d 789], the court held that statements made by a minor at a fitness hearing and to her probation officer could not be used as substantive evidence against her at trial. And, in *People v. Weaver* (1985) 39 Cal.3d 654 [217 Cal.Rptr. 245, 703 P.2d 1139], the court held that testimony of a probationer given at a probation revocation hearing could not be used against him in a subsequent trial, except under limited circumstances for purposes of impeachment or rebuttal.

The analysis used by the court in *Ramona R.* and *Weaver* is germane to this appeal. In support of its conclusions, the court, noting the exception to section 28(d) for statutory rules of evidence, relied upon Evidence Code section 940 which declares that "To the extent that such privilege exists under the Constitution of the United States or the State of California, a person has a privilege to refuse to disclose any matter that may tend to incriminate him." According to the court, "It is true that section 940 does not on its face refer to use immunities. However, the language of that provision is purposefully broad, and is meant to include within its reach judicial decisions relating to the privilege against self-incrimination." (*Ramona R. v. Superior Court, supra,* 37 Cal.3d 802, 808; *People v. Weaver, supra,* 39 Cal.3d 654, 659.) Finally, noting that the use immunities and accompanying exclusionary rules previously recognized were "essential to California's privilege against self-incrimination," the court found that they fell within the statutory rule of evidence exception of section 28(d). (*Ramona R., supra,* at p. 811; *Weaver, supra,* at p. 659.)

■ Likewise, in this case, a statutory rule of evidence, namely, Evidence Code section 1204, as interpreted by judicial decisions, provides Clyde and Tommy with the necessary standing to challenge the voluntariness of Raymond's confession. As an existing statutory rule of evidence, the exclusionary right survives the passage of section 28(d).[2]

---

[2] Section 1204 of the Evidence Code provides: "A statement that is otherwise admissible as hearsay evidence is inadmissible against the defendant in a criminal action if the statement was made, *either by the defendant or by another,* under such circumstances that it is inadmis-

■ In *People* v. *Berve* (1958) 51 Cal.2d 286 [332 P.2d 97], the court stated, "The use of confessions in a criminal prosecution obtained by force, fear, promise of immunity or reward constitutes a denial of due process of law both under the federal and state Constitutions requiring a reversal of the conviction although other evidence may be consistent with guilt. [Citations.]" (*Id.,* at p. 290.) This is so because "it offends 'the community's sense of fair play and decency' to convict a defendant by evidence extorted from him ...." (*People* v. *Atchley* (1959) 53 Cal.2d 160, 170 [346 P.2d 764].) Furthermore, the exclusionary rule extends to the "fruits" of the confession tainted by the initial coercion. (*People* v. *Ditson* (1962) 57 Cal.2d 415, 439 [20 Cal.Rptr. 165, 369 P.2d 714].) "[T]hat sense of fair play and decency [requiring exclusion of involuntary confessions] is no less offended when a defendant is convicted by real evidence which the police have discovered *essentially by virtue of having extorted such a confession.* If one amounts to a denial of a fair trial and due process of law, so must the other." (*Id.,* at p. 439.)

■ The constitutionally mandated exclusion of a coerced confession and of evidence obtained as a result of that unlawfully obtained confession is equally applicable when introduction of the same evidence is sought at the trial of another. (*People* v. *Gordon, supra,* 84 Cal.App.3d 913, 919, 925; accord *People* v. *Enriquez, supra,* 132 Cal.App.3d 784, 792-793; *In re Jessie L., supra,* 131 Cal.App.3d 202, 209; *People* v. *Jones, supra,* 105 Cal.App.3d 572, 581; *People* v. *Felix, supra,* 72 Cal.App.3d 879, 885; see also *People* v. *Leach* (1985) 41 Cal.3d 92, 103 [discussing the appropriate standard to determine voluntariness when the coerced individual is not the defendant].)

■ In accord with the Supreme Court's reasoning in *Ramona R.* and *Weaver,* we find it clear that exclusion of a coerced confession and all tainted fruits thereof is "essential" to the rights of due process asserted by Clyde and Tommy.

Nor do we believe, as did the trial court, that *In re Lance W.* (1985) 37 Cal.3d 873 [210 Cal.Rptr. 631, 694 P.2d 744], requires a contrary conclusion. In *Lance,* the court held that section 28(d) abrogated the "vicarious exclusionary rule" for Fourth Amendment search and seizure violations. (*Id.,* at p. 910.) However, there are at least two features of this appeal which distinguish it from *Lance.*

As asserted at trial and on appeal, the minors' claim of error is premised upon Fifth Amendment and not Fourth Amendment grounds. The *Lance*

sible against the defendant under the Constitution of the United States or the State of California." (Italics added.)

court expressly stated that its decision applied only to Fourth Amendment violations and expressly reserved the "question of whether section 28(d) mandates admission of evidence obtained in violation of *other constitutional guarantees ....*" (*Id.,* at p. 885, fn. 4; italics added.)[3] Thus, *Lance* is not dispositive of the issue on appeal in this case. Instead, we must conduct our own examination into the implications of section 28(d) as to alleged violations of Fifth Amendment due process rights. Furthermore, as demonstrated below, it is evident that the conclusion in *Lance* was compelled by another circumstance not here present.

In *Lance,* there was a clear contradiction between state and federal law on the issue of the vicarious exclusionary rule for Fourth Amendment violations. (Cf. *People* v. *Martin* (1955) 45 Cal.2d 755, 761 [290 P.2d 855] [recognizing vicarious standing under the state Const.] with *Alderman* v. *United States* (1969) 394 U.S. 165, 171-176 [22 L.Ed.2d 176, 183-188, 89 S.Ct. 961] [holding that vicarious standing did not exist under the Fourth Amend.].) In contrast, the United States Supreme Court has never ruled on the issue of a third party's right to challenge the voluntariness of another's confession on due process grounds. However, several lower federal courts have recognized an analogous right premised upon a defendant's due process right to a fair trial.

In *Bradford* v. *Johnson* (E.D.Mich. 1972) 354 F.Supp. 1331, the court held that the defendant was denied the right to a fair trial guaranteed under the Fourteenth Amendment when his conviction was obtained by the use of a coerced confession by a witness. " 'As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice. . . . Such unfairness exists when a coerced confession is used as a means of obtaining a verdict of guilt.' " (*Id.,* at pp. 1337-1338, quoting *Lisenba* v. *California* (1941) 314 U.S. 219, 236-237 [86 L Ed 166, 179-190, 62 S.Ct. 280].)

In *United States* ex rel. *Cunningham* v. *DeRobertis* (7th Cir. 1983) 719 F.2d 892, 896, the court acknowledged that "a violation of another's Fifth Amendment rights may rise to the level of a violation of [defendant's] own right to a fair trial," but concluded that no such violation had occurred where the confession was determined to be voluntary.

Finally, in *LaFrance* v. *Bohlinger* (1st Cir. 1974) 499 F.2d 29, (cert. den. 419 U.S. 1080 [42 L.Ed.2d 674, 95 S.Ct. 669]), the court prohibited the use of an allegedly coerced statement by a witness even for impeachment pur-

---

[3] The court also stated, "Although there may be doubt as to the proper construction and scope of application of section 28(d) in other contexts, we find no uncertainty with regard to its application to unlawfully seized evidence." (*Lance, supra,* at pp. 885-886, fn. omitted.)

poses until a determination had been made as to the voluntariness of the statement. More importantly, the court denied that a defendant's exclusionary right was in fact premised upon a vicarious assertion of the constitutional right of another. "Since our decision is premised upon the rationale that use of coerced testimony entails a violation of the defendant's due process right to a fair trial, there is no standing problem. LaFrance is not complaining of the purported denial of Brown's constitutional rights, but only of his own." (*Id.*, at p. 35.)

In sum, federal law supports the position adopted by the California courts that a defendant may challenge the voluntariness of another's allegedly coerced confession and the fruits thereof.

We conclude, therefore, that the right to challenge another's coerced confession, and the corollary right to exclude such an involuntary confession and the fruits gathered as a result thereof, did survive the passage of section 28(d). In support of our conclusion we find that the purposes for exclusion of a coerced confession and its fruits at any trial are as imperative today as before the passage of section 28(d); that the exclusionary right fits within the statutory rule of evidence exception to section 28(d); and, finally, that the exclusionary right is supported by federal law.

### III.

#### Coerced Confession

" 'If an individual's "will was overborne" or if his confession was not "the product of a rational intellect and a free will," his confession is inadmissible because coerced. These standards are applicable whether a confession is the product of physical intimidation or psychological pressure ....' " (*People* v. *Sanchez* (1969) 70 Cal.2d 562, 572 [75 Cal.Rptr. 642, 451 P.2d 74].) The determination of voluntariness is made upon the totality of circumstances surrounding the confession. (*Ibid.*; *Procunier* v. *Atchley* (1971) 400 U.S. 446, 453 [27 L.Ed.2d 524, 530-531, 91 S.Ct. 485].) "If the confession was elicited by promises of benefit or leniency the evidence was inadmissible. [Citations.]" (*People* v. *Carr* (1972) 8 Cal.3d 287, 296 [104 Cal.Rptr. 705, 502 P.2d 513]; see *People* v. *Hill* (1967) 66 Cal.2d 536, 549 [58 Cal.Rptr. 340, 426 P.2d 908]; *People* v. *Johnson* (1969) 70 Cal.2d 469, 478-479 [74 Cal.Rptr. 889, 450 P.2d 265].)

The People contend that Officer Marovich's repeated statements to the boys, "If you tell me a lie, and I find out the boxes are stolen, you will go to jail, but if you tell me the truth you will get a citation," were merely

"exhortations" to the boys to tell the truth, or an explanation of the full consequences of lying to him. We disagree.

In *People v. Hill, supra,* 66 Cal.2d 536, the California Supreme Court established a standard to determine whether statements by the police were merely exhortations to tell the truth or promises of benefit or leniency. According to the court, the distinction "does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth, as represented by the police." (*Id.,* at p. 549.) The court then enunciated the appropriate standard: "When the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct, we can perceive nothing improper in such police activity. On the other hand, if in addition to the foregoing benefit, or in the place thereof, the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible." (*Ibid.*)

In *People v. Johnson, supra,* 70 Cal.2d 469, the officers informed a suspect that he had been accused of first degree murder and that he might go to the gas chamber. The officers exhorted the suspect to tell the truth, for the reason that no one would believe his denial of complicity. In holding that the subsequent confession was involuntary, the court stated: "This appears to be more than merely pointing out to a suspect that which flows naturally from a truthful and honest course of conduct. It carries the implication that by cooperating and telling what actually happened he might not be accused of or found guilty of first degree murder (i.e., more lenient treatment by the court or jury). To someone unskilled and uncounseled in the law it might have offered a hope ... that he might be cleared of any serious charges." (*Id.,* at p. 479.)

In *People v. Brommel* (1961) 56 Cal.2d 629 [15 Cal.Rptr. 909, 364 P.2d 845], the police informed the suspect that unless he changed his story (in which he denied that he had beaten his daughter), the officers would write the word "liar" on their report to the judge. The court held that such conduct amounted to both a threat and an impied promise of leniency, rendering the subsequent confession inadmissible.

In *People v. McClary* (1977) 20 Cal.3d 218 [142 Cal.Rptr. 163, 571 P.2d 620], the officers repeatedly branded defendant a liar, and advised her that unless she changed her statement and admitted the true extent of her complicity, she would be charged as a principal to murder and would face the death penalty. In doing so, according to the court, "the officers strongly

implied that if defendant changed her story and admitted mere 'knowledge' of the murder, she might be charged only as an accessory after the fact." (*Id.,* at p. 229.)

The factual scenario presented in this appeal is even more compelling than those discussed above. Unlike the situations in *Johnson, Brommel* and *McClary,* no implication is necessary to determine whether Officer Marovich's statement impermissibly led the young boys to expect more lenient treatment in exchange for their confessions. The potential benefits that the boys could expect (lesser punishment and immediate release with only a citation) were clearly and expressly spelled out by Officer Marovich himself.[4]

Moreover, viewing the totality of circumstances we conclude that it was Officer Marovich's promise of leniency and not an exercise of "free will" that prompted Raymond to confess. Shortly before he confessed, Raymond sat handcuffed with the two other youths in the back of a police vehicle. He was aware that previous untrue explanations for the source of the coatracks had not gained him his freedom. Officer Marovich again repeated his statement to the boys. Within a matter of seconds Raymond said to the other boys in the car, "Forget that. I can't go back to jail." He then indicated to the officers that he wanted to confess.

Under such circumstances, we must conclude that Raymond's confession was involuntary and thus inadmissible at the trial of the other youths. The tainted fruits of the involuntary confession must also be excluded. Since the heart of the prosecution's case, consisting of the source of the coatrack boxes and the fact that they had been stolen, all flowed from Raymond's coerced statement, the juvenile court's orders declaring the minor defendants wards of the court and placing them on probation must be reversed.[5]

---

[4] The People cite two cases as contrary authority to our conclusion in this case. They argue that an officer may comment upon the realities of the situation without rendering a subsequent confession involuntary. (*People* v. *Seaton* (1983) 146 Cal.App.3d 67 [194 Cal.Rptr. 33]; *In re Gomez* (1966) 64 Cal.2d 591 [51 Cal.Rptr. 97, 414 P.2d 33].) With this principle we agree. However, Officer Marovich did more than simply comment upon the realities of the situation; he expressly promised the boys leniency if they confessed. In both the cases cited by the Attorney General, the court explicitly noted that no such express promise had been made. "We . . . conclude no express threats or promises of leniency were made." (*People* v. *Seaton, supra,* at p. 74.) "Although it is undisputed that petitioner's parole officer . . . stated that by [taking a lie detector test] petitioner might improve his chances of remaining on parole, the parole officer did not tell petitioner that those chances would be improved if he confessed or that his parole would be revoked if he did not." (*In re Gomez, supra,* at p. 593.)

[5] In view of our conclusion in this regard, we need not discuss the additional argument raised by Tommy alone, that the boys' initial detention by Officer Marovich was unlawful.

The orders are reversed.

Smith, J., and Benson, J., concurred.