Filed 10/9/15  In re Cristofer A. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re CRISTOFER A., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, Plaintiff and Respondent, v. CRISTOFER A., Defendant and Appellant. | A140683 (Contra Costa County Super. Ct. No. J1000744) |

Cristofer A. (Minor) appeals from a judgment of the juvenile court finding he had committed arson and vehicle theft and had given false information to a peace officer.  His principal contention on appeal is that certain incriminating statements he made to the police were procured in violation of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).  Minor also challenges the sufficiency of the evidence to support the arson charge.  Finally, he argues the juvenile court incorrectly calculated his maximum period of confinement.

We reject all of Minor's contentions save the last.  The People agree Minor's maximum period of confinement was miscalculated, and the parties' calculations of the maximum period are in accord.  We will therefore order the judgment modified to correct Minor's maximum period of confinement.  In all other respects, we affirm.

1

FACTUAL AND PROCEDURAL BACKGROUND

We set forth the facts of the underlying offenses, organizing them in the order of the counts in the operative petition. Additional facts relevant to particular legal issues are included in the discussion section of this opinion.

*Count One—Arson*

On the evening of May 6, 2013, Stephanie Iglesias was on her way to church when she saw a burgundy Toyota Corolla parked in the middle of the street. The car was occupied by teenaged boys. One of the car doors was open, as if the young men were waiting for someone. By the side of the road was a downward sloping hill with dry grass. As Iglesias was stopped behind the Toyota, she saw a young Hispanic man running away from the hill and laughing. Iglesias saw a "lot of smoke come from behind him." She thought Minor looked "really similar" to the individual she had seen running.

The Toyota was only a few feet from the area of smoke, which quickly turned to flames. By the time Iglesias drove around the block, there were "flames everywhere." The dry field was on fire, and the flames were heading toward nearby houses. The Toyota drove off, and Iglesias wrote down the license plate number of the car and gave it to a neighbor. She later spoke to the police.

Fire Department Battalion Chief Lon Goetsch responded to the grass fire about 7:00 p.m. that evening. The fire, which was about 75 feet wide and 50 feet deep in an area of dry grass, was quickly suppressed. It had probably been burning about 10 minutes. Goetsch said the fire occurred in "an undeveloped area[.]" He located the suspected point of origin, where he found the burned remnants of a red cigarette lighter. There were also remnants of what could have been paper or cardboard in the same general area. Based on all of the circumstances, Goetsch suspected the fire was caused by a person. He opined that if someone had been seen running from the area of the fire, and that person had admitted lighting objects on fire and tossing them to the ground, it would further support a finding of arson. Goetsch called the police to the scene.

San Pablo Police Officer Aaron Blaisdell was dispatched to the scene of the fire at 7:14 p.m. on May 6, 2013. Chief Goetsch pointed out the remnants of a cigarette lighter

2

and some cardboard and said he suspected arson.  Blaisdell spoke to Stephanie Iglesias later that evening.  Iglesias described her observations and said she had followed the Toyota that left the scene of the fire.

After obtaining the Toyota's license plate number, Blaisdell learned the vehicle was parked near San Pablo Avenue between two and three miles from the location of the fire.  Blaisdell spoke to Minor and his mother at their home, and both said the Toyota had not been driven that day.  After Blaisdell asked to see the Toyota, Minor and his mother showed it to him.  The hood of the Toyota was warm, which indicated to the officer that the car had been driven recently.  When Blaisdell again asked if the vehicle had been driven that day, Minor said he had driven it that morning, but only to switch parking spaces.  Blaisdell used "a ruse" and said he had proof Minor had been in San Pablo with the car.  Minor looked at his mother, then said, " 'What are you talking about?' " Blaisdell claimed he had video surveillance footage of Minor starting the fire and told Minor it would only make things worse if he lied.  After several moments, Minor told Blaisdell he was just lighting cardboard on fire but he did not mean for the fire to get that big.  At that point, Blaisdell placed Minor under arrest.

Officer Blaisdell conducted a videotaped interview of Minor at the police station after advising Minor of his rights under *Miranda*.[1]  Minor said he and his friends went to " 'the spot with the view where everyone goes to kick it' " "to smoke cigarettes and hang out."  Minor was playing with a red cigarette lighter and a cardboard folder.  He lit the folder on fire and walked several yards down the hillside, where he threw the folder and lighter onto the ground.  The hillside "quickly lit on fire," and once Minor realized he could not extinguish it, he fled.  He told Officer Blaisdell he intended to light the area on fire but did not know the fire would grow so large.

Officer Blaisdell later searched the Toyota and found a glass Mason jar behind the front passenger seat.  Inside the jar were a partially burned piece of cardboard and a partially burned piece of twisted paper.  Minor initially denied knowing anything about

---

[1] A CD/DVD recording of the interview was played at the dispositional hearing, but the parties stipulated it need not be transcribed by the reporter.

3

the jar but later admitted that when he was on the hillside, he had been lighting items on fire and putting them in the closed jar to see how long the smoke would linger.

*Counts Three and Four—Vehicle Theft and Providing False Information*

On July 9, 2013, Salvador Coto reported to the Richmond police that his gray Nissan Sentra had been stolen. Coto had not given anyone permission to drive his car between July 9 and July 13, 2013, and he did not know Minor. His car was recovered a few days later. It was undamaged, but a box of tools and some electrical cables had been taken from the trunk.

About 10:30 p.m. on July 13, 2013, Richmond Police Officer Khoa Nguyen learned a gray Nissan Sentra he had been following was stolen. Before Nguyen could pull the Nissan over, Minor, who was driving the car, pulled over on his own. Minor and a passenger jumped out of the Nissan. When Nguyen ordered them back into the car, the passenger fled, but Minor complied with Nguyen's order to get on the ground. Nguyen found a shaved key on the ground next to the Nissan.[2] Minor did not have any identification. He said his name was Alex Diaz. At booking, however, Minor identified himself as Cristofer Diaz. When Nguyen contacted Minor's mother, he learned Minor's true name. Minor admitted to having lied about his name and apologized to Nguyen for doing so.

*Petition, Jurisdiction, Disposition, and Appeal*

On May 28, 2013, the Contra Costa County District Attorney filed a fourth supplemental wardship petition (Welf. & Inst. Code, § 602), which was amended on July 16, 2013, and September 11, 2013, alleging Minor, then aged 17, had committed arson (Pen. Code, § 451, subd. (c), count one),[3] receiving stolen property (§ 496d, count two),[4] vehicle theft (Veh. Code, § 10851, subd. (a), count three), and giving false information to a peace officer, a misdemeanor (§ 148.9, subd. (a), count four).

---

[2] The officer explained that a "shaved key" is one on which the teeth have been filed down so the key can be inserted into a door lock and/or ignition and used to start vehicles.

[3] All further undesignated statutory references are to the Penal Code.

[4] The juvenile court later dismissed this count.

4

On October 21, 2013, the juvenile court sustained the petition as to counts one, three and four. On December 10, 2013, the juvenile court continued Minor as a ward of the court and ordered he be committed to the Youth Offender Treatment Program for a period not to exceed 8 years 11 months and 8 days, or until age 21, whichever occurs first, with credits of 151 days.

Minor filed a timely notice of appeal.

### DISCUSSION

Minor's principal contention on appeal is that his statements to the police were taken in violation of his *Miranda* rights, and thus the juvenile court erred in admitting them. Minor first contends the juvenile court erred by failing to exclude his initial statement to Officer Blaisdell, in which he admitted culpability regarding the arson charge. Minor argues the statement was obtained in violation of his *Miranda* rights because it occurred during a custodial interrogation. As to the statements made after he was advised of his rights, Minor argues they were the result of the two-step custodial interrogation prohibited under *Missouri v. Seibert* (2004) 542 U.S. 600 (*Seibert*) and were thus also inadmissible. He also asserts his post-*Miranda* statements were involuntary.[5] He further argues there was insufficient evidence to sustain the arson charge. Finally, Minor contends he received an unauthorized sentence because the juvenile court erroneously calculated his maximum period of confinement.

We address these contentions in turn.

I.    *Minor Was Not Subjected to Custodial Interrogation Outside of His Home.*

Minor filed a motion in limine to exclude the statements he made to Officer Blaisdell on May 6, 2013. The juvenile court held an Evidence Code section 402 hearing on the motion. It specifically credited Officer Blaisdell's testimony, and did not credit

---

[5] We need not address Minor's claim that his trial counsel was ineffective for failing to object to admission of his confession at the jurisdiction hearing. This argument appears to be premised on the assumption that trial counsel was required at the jurisdiction hearing to reiterate the objection already made by motion in limine. The People agree, however, that Minor preserved the issue for appellate review by filing the motion, and no further objection was necessary. (See *People v. Crittenden* (1994) 9 Cal.4th 83, 127.)

the testimony of Minor or his mother. The following background is drawn from Blaisdell's testimony at the hearing.[6]

### A. *Factual Background*

Officer Blaisdell said a car seen leaving the area of the fire on May 6, 2013, was registered to Minor's mother at an address on San Pablo Avenue. When Blaisdell went to that address at about 10:30 that night, he was alone and in full uniform. Minor's mother answered the door, and Minor was standing nearby. The officer asked Minor's mother whether she owned a red Toyota Corolla, and she said yes. Blaisdell asked where it was, and she said it was parked on a nearby street. When Blaisdell asked whether the vehicle had been driven that day, Minor and his mother both said it had not. After the officer asked to see the vehicle, Minor and his mother took him to its location. Blaisdell testified, "It was a calm conversation. It was not accusatory at all. I was simply conducting an investigation. At that point, we know that she owns a red Toyota Corolla. I wasn't able to actually verify the plate until I went over there and looked at the vehicle." At no time was Blaisdell alone with Minor; the latter's mother was always present.

The license plate, color, and make and model of the vehicle matched the description of the suspect vehicle. When Officer Blaisdell felt the hood of the vehicle, he found that it was warm. He thought the vehicle had been parked within the last 30 minutes to an hour. He again asked if it had been driven that day. Minor claimed he had driven the vehicle that morning, but only to switch parking spaces, which was inconsistent with the warmth of the hood. At the time Blaisdell was asking questions, he was about eight to ten feet from Minor and his mother, who were standing near the rear of the vehicle.

---

[6] Since the issue before us is the correctness of the juvenile court's ruling on the motion to suppress, we look only at the record produced at the Evidence Code section 402 hearing. (See *In re Arturo D.* (2002) 27 Cal.4th 60, 77, fn. 18 ["in reviewing the trial court's suppression ruling, we consider only the evidence that was presented to the trial court at the time it ruled"].) In addition, we must resolve all factual conflicts in the manner most favorable to the juvenile court's disposition of the motion. (*Id*. at p. 77.)

After Minor made his statement about driving the vehicle, Officer Blaisdell "rused [him] by advising him that [he] had video surveillance of the area where the fire was ignited." Blaisdell then told Minor he had surveillance footage of him with the Toyota in San Pablo several hours earlier. The officer testified he "did not raise [his] voice or come across as intimidating by any means." Minor asked Blaisdell, " 'What are you talking about?' " Blaisdell "continued with the ruse" and advised Minor he had video surveillance footage of Minor starting the fire. He told Minor not to lie "because it would only make things worse." Minor "pondered for several moments" and then said, " 'I was just lighting cardboard on fire. I didn't mean for it to get that big.' " At that point, Blaisdell placed Minor under arrest.

Minor's mother had been present throughout the two-minute conversation by the vehicle. The time that elapsed between Blaisdell's arrival at Minor's home to the arrest was six to eight minutes at most. The officer testified that before Minor made his statement, he was free to leave. Blaisdell took Minor to the San Pablo Police Department, and during the five-minute ride, he had no conversation with him. He did not ask Minor what happened earlier that day because he "hadn't read him his rights yet."

Officer Blaisdell placed Minor in an interview room. Before questioning him, Blaisdell advised Minor of his *Miranda* rights, which Minor acknowledged. Blaisdell had not advised Minor of his *Miranda* rights before that time. )

After the interview, Officer Blaisdell drove Minor home. In the presence of Minor, his mother, and another officer, Blaisdell searched the Toyota Corolla. Before conducting the search, Blaisdell obtained consent from Minor's mother to search the vehicle and residence. Blaisdell explained he had wanted to search the vehicle earlier, because he suspected there might be evidence related to the arson, but he could not do so because he was alone.

The juvenile court also considered the first two minutes of People's exhibit 1, a videotape of Minor's interview at the police station. The record contains a one-page transcript of a portion of the interview that includes the *Miranda* admonitions given to appellant.

7

After hearing argument from the parties and making its credibility findings, the juvenile court found Minor had not been subject to custodial interrogation when he made his initial statement to Blaisdell. It further found that the statements made after Minor was Mirandized were voluntary.

B.     *Governing Law and Standard of Review*

"[A]n officer's obligation to administer *Miranda* warnings attaches only where there has been such a restriction of freedom of movement as to render the suspect 'in custody.' " (*In re Joseph H.* (2015) 237 Cal.App.4th 517, 530, citing *Stansbury v. California* (1994) 511 U.S. 318, 322 (*Stansbury*); see also *In re Joseph R.* (1998) 65 Cal.App.4th 954, 958 [*Miranda* applies only to custodial interrogations].) "For *Miranda* purposes, custodial status arises if a person has been 'taken into custody or otherwise deprived of his freedom of action in any significant way.' [Citation.]" (*People v. Elizalde* (2015) 61 Cal.4th 523, 531.) In the *Miranda* context, the term interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301, fns. omitted.)

"The test for Miranda custody is, ' "would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." ' [Citation.] The objective circumstances of the interrogation are examined, not the ' "subjective views harbored by either the interrogating officers or the person being questioned." ' [Citation.]" (*People v. Kopatz* (2015) 61 Cal.4th 62, 80; accord, *People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403 (*Pilster*) [custody determinations are resolved by an objective standard].) Even if an individual is the focus of police questioning when interviewed, warnings are not required if the suspect is not in custody. (*Stansbury, supra,* 511 U.S. at p. 323.)

The custody determination depends on an examination of all the circumstances surrounding the interrogation. (*J.D.B. v. North Carolina* (2011) 131 S.Ct. 2394, 2402 (*J.D.B.*) [declining to demarcate specific relevant circumstances].) "Although no one factor is controlling, the following circumstances should be considered: '(1) [W]hether

the suspect has been formally arrested; (2) absent formal arrest, the length of the detention; (3) the location; (4) the ratio of officers to suspects; and (5) the demeanor of the officer, including the nature of questioning.' [Citation.] Additional factors are whether the suspect agreed to the interview and was informed he or she could terminate the questioning, whether police informed the person he or she was considered a witness or suspect, whether there were restrictions on the suspect's freedom of movement during the interview, and whether police officers dominated and controlled the interrogation or were 'aggressive, confrontational, and/or accusatory,' whether they pressured the suspect, and whether the suspect was arrested at the conclusion of the interview. [Citation.]" (*Pilster, supra,* 138 Cal.App.4th at pp. 1403-1404.) In addition, a juvenile suspect's age is a relevant factor, "so long as [it] was known to the officer at the time of police questioning, or would have been objectively apparent to a reasonable officer[.]" (*J.D.B., supra,* 131 S.Ct. at p. 2406.)

In reviewing the juvenile court's decision on a *Miranda* issue, we accept that court's determination of disputed facts if supported by substantial evidence, but we independently decide whether the statements at issue were obtained in violation of *Miranda*. (*In re Joseph H., supra,* 237 Cal.App.4th at p. 530.) We also accept the juvenile court's evaluations of witness credibility. (*People v. Elizalde, supra,* 61 Cal.4th at p. 530.) We may not set aside the juvenile court's ruling on the *Miranda* issue " 'unless it is "palpably erroneous." ' " (*In re Eric J.* (1979) 25 Cal.3d 522, 527, quoting *People v. Duren* (1973) 9 Cal.3d 218, 238.)

C.      *The Relevant Factors Support the Juvenile Court's Finding that Minor Was Not in Custody When He Was Questioned Near His Home.*

Having examined the record before the juvenile court through the lens of the relevant factors, we conclude Minor was not subjected to custodial interrogation outside of his home. Minor was not formally arrested until the end of the questioning. He was interviewed by Officer Blaisdell, who was alone, for less than 10 minutes near his home and was always in the presence of his mother. (See *In re Danny E.* (1981) 121 Cal.App.3d 44, 50 ["Here the questioning took place at appellant's own home; no

9

objective indicia of arrest or detention were apparent, and the questioning was brief and non-accusatorial."].)  Blaisdell was not confrontational and spoke politely to Minor and his mother.  There is no evidence the officer was coercive or attempted to pressure Minor, and he did not restrict Minor's freedom of movement.[7]  (Cf. *In re Joseph R., supra,* 65 Cal.App.4th at pp. 957-958, 961 [minor was not in custody and *Miranda* warnings were not required even though minor had been handcuffed by police and placed in patrol car for several minutes].)

Nor does Minor's age support an inference he was in custody.  As Officer Blaisdell knew, Minor was 17 years old at the time he was questioned.  Minor had thus almost reached the age of majority.  And contrary to his claim on appeal, there is nothing to suggest the juvenile court failed to take his age into consideration when ruling on the *Miranda* issue.  Minor bases this claim on nothing more than his interpretation of the prosecution's argument at the suppression hearing, which he views as having implied "that the juvenile court should disregard [his] testimony and by extension, his age, as a factor . . . in the custody analysis."  We decline Minor's unspoken invitation to presume the juvenile court failed to perform its duty to consider his age, because a bedrock principle of appellate review requires us to presume the opposite.[8]  (*In re Julian R.* (2009)

---

[7] Minor claims his freedom of movement was restricted during questioning, but this portion of his brief is devoid of citations to the evidence before the juvenile court.  (See *People v. Mays* (2007) 148 Cal.App.4th 13, 34 ["It is not sufficient to assert there was error; the appellant must support his claim by citations to the record."].)  He also claims no reasonable 17-year-old would feel free to refuse to speak to the police while his mother stood nearby.  Minor points to nothing in the hearing testimony suggesting his mother's presence made him feel less free to leave.  Indeed, the juvenile court could reasonably have inferred Minor felt supported and more secure in the presence of his mother.  (Cf. *In re Joseph H., supra,* 237 Cal.App.4th at p. 535 [rejecting argument that presence of minor's stepmother created coercive atmosphere where minor frequently looked to her for support].)

[8] For the same reason, we reject Minor's argument that the juvenile court failed to evaluate objectively the totality of the circumstances of his interrogation.  Minor argues that because the juvenile court found Officer Blaisdell's testimony credible but rejected his testimony and that of his mother, the lower court failed to evaluate the totality of the circumstances.  Minor's argument essentially asks us to set aside the juvenile court's

47 Cal.4th 487, 498-499 [reviewing court presumes juvenile court knows and follows applicable law]; see also Evid. Code, § 402, subd. (c) ["A ruling on the admissibility of evidence implies whatever finding of fact is prerequisite thereto; a separate or formal finding is unnecessary unless required by statute."].)

III.  *Substantial Evidence Supports the Juvenile Court's Implied Finding that Officer Blaisdell Did Not Deliberately Circumvent Miranda.*

Minor contends Officer Blaisdell used a two-step interrogation process designed to obtain a confession in violation of his constitutional rights. He relies principally on the plurality opinion in *Seibert, supra,* 542 U.S. 600.[9] We find that case distinguishable from the one before us, and we conclude the juvenile court did not err.

A.  *Seibert Is Factually Distinguishable.*

In *Seibert,* police officers awakened the defendant at 3:00 a.m. at a hospital where her son was being treated for burns and placed her under arrest. (*Seibert, supra,* 542 U.S. at p. 604.) The arresting officers testified they had specifically followed police protocol by deliberately refraining from reading the defendant *Miranda* warnings after her arrest, then questioning her for 30 to 40 minutes at the police station, after which she admitted culpability for the victim's death. (*Id*. at pp. 604-605.) After a 20-minute break, the officers read the defendant her *Miranda* rights and obtained a written waiver. (*Id*. at

---

credibility determinations. We may not do so, because assessing credibility "is the exclusive province of the trier of fact[.]" (*In re Ryan N.* (2001) 92 Cal.App.4th 1359, 1372.)

[9] As explained below, *Seibert* created an exception to the United States Supreme Court's holding in the earlier case of *Oregon v. Elstad* (1985) 470 U.S. 298 (*Elstad*). In *Elstad*, the court held a suspect's voluntary incriminating statement made in custody pursuant to a waiver of *Miranda,* following an earlier incriminating statement obtained by custodial questioning without a *Miranda* warning, may be admissible. (*Id*. at pp. 309, 314, 318.) The Court also held that a *Miranda* violation does not require full application of the " 'fruit of the poisonous tree' " doctrine developed for Fourth Amendment violations. (*Id*. at pp. 305-309.) Instead, if an unwarned custodial statement was voluntary, a later statement must be deemed untainted if also voluntary and in compliance with *Miranda*. (*Id*. at p. 318.) The court further noted that, in determining whether the second statement was voluntary, the suspect's awareness that he had already " 'let the cat out of the bag' " is not dispositive. (*Id*. at p. 304.)

p. 605.) They then asked her essentially the same questions to extract the incriminating admissions she had previously made. (*Ibid.*) At the suppression hearing, the officer testified that "he made a 'conscious decision' to withhold *Miranda* warnings, thus resorting to an interrogation technique he had been taught: question first, then give the warnings, and then repeat the question 'until I get the answer that she's already provided once.' " (*Id.* at pp. 605-606.)

The foregoing demonstrates how different the facts of *Seibert* are from those before us. "Unlike in *Seibert,* here there was no evidence of any protocol used in eliciting [Minor's] confession. Moreover, in *Seibert,* when the suspect was interrogated, [he] was already under arrest and in custody. The *Seibert* court was not required to decide . . . whether the suspect was in custody. That case therefore provides no guidance on that point." (*In re Kenneth S.* (2005) 133 Cal.App.4th 54, 65-66.) Similarly, in this case there is no evidence of any police policy or protocol that was used to obtain Minor's confession.

B.   *Seibert's Holding Requires Proof of the Deliberate Use of a Two-Step Interrogation Process Before a Confession Will Be Excluded.*

The plurality in *Seibert* held inadmissible the defendant's statement in that case. (*Seibert, supra,* 542 U.S. at p. 604.) It found the police officers' "midstream recitation of warnings after interrogation and unwarned confession could not effectively comply with *Miranda's* constitutional requirement[.]" (*Ibid.*) The plurality explained that the circumstances to be considered in determining the effectiveness of the post-admission *Miranda* warnings include "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." (*Id.* at p. 615.) The plurality distinguished *Elstad,* noting that in *Elstad,* the officer's initial failure to warn the defendant was an "oversight" or good-faith mistake based on confusion about whether the brief exchange qualified as a custodial

interrogation, and that the later more in-depth station house interrogation was preceded by *Miranda* warnings. (*Seibert, supra,* at pp. 614-615.)

Justice Kennedy filed a concurring opinion in *Seibert* and provided the fifth vote for the judgment. (*Seibert, supra,* 542 U.S. at pp. 618-622 (conc. opn. of Kennedy, J.).) Justice Kennedy "narrowed the *Seibert* exception to those cases involving deliberate use of the two-step procedure to weaken *Miranda's* protections." (*U.S. v. Williams* (9th Cir. 2006) 435 F.3d 1148, 1157.) He concluded the admissibility of postwarning statements should continue to be governed by *Elstad* unless a *deliberate* two-step strategy was employed, in which case the postwarning statements must be excluded unless curative measures were taken before the postwarning statements were made. (*Seibert, supra,* 542 U.S. at p. 622 (conc. opn. of Kennedy, J.).) "Because Justice Kennedy 'concurred in the judgment [] on the narrowest grounds' [citation], his concurring opinion represents the *Seibert* holding." (*People v. Camino* (2010) 188 Cal.App.4th 1359, 1370, fn. omitted (*Camino*).)

C. *The Evidence Before the Juvenile Court Supports its Implied Finding.*

The juvenile court's determination of whether the police deliberately used a two-step strategy is a factual finding to which we owe deference. (*Camino, supra,* 188 Cal.App.4th at p. 1372.) Here the court made no express factual finding on this issue, but Minor had requested that it review his second statement under *Seibert*; we may therefore imply the court found there was no deliberate use of a two-step interrogation process. (Evid. Code, § 402, subd. (c).) The juvenile court found Officer Blaisdell's testimony credible, and it did not credit the testimony of Minor or his mother. From Blaisdell's account of his questioning, summarized above, "it was not unreasonable [for the juvenile court] to see the occasion for questioning at the station house as presenting a markedly different experience from the short conversation at [Minor's] home[.]" (*Seibert, supra,* 542 U.S. at p. 615.) There was nothing in the testimony to suggest Blaisdell deliberately used a two-step interrogation. The juvenile court reviewed a video of the station house interrogation. Based on that review, as well as on its assessment of Blaisdell's

13

credibility, the juvenile court could reasonably find the officer did not deliberately circumvent *Miranda*. (*Camino, supra,* 188 Cal.App.4th at p. 1376.)

IV. *Substantial Evidence Supports the Juvenile Court's Finding that Minor's Post-Miranda Statements Were Voluntary.*

Minor contends his post-*Miranda* statements were involuntary because he made them after a promise of leniency. Minor finds the alleged promise in the following statement Officer Blaisdell made after giving the *Miranda* advisements: "So, . . . , I'll tell you, make things a lot easier if what you tell me matches what I've got on the video tape, man. . . . So, know it's up to you if you want to make the story different man, we can have this over in 5 minutes and, know, most likely be able to take you home, or you know, you know." We hold the juvenile court did not err in concluding this statement did not render Minor's post-*Miranda* statements involuntary.

A. *Governing Law and Standard of Review*

"To establish a valid waiver of *Miranda* rights, the prosecution must show by a preponderance of the evidence that the waiver was knowing, intelligent, and voluntary." (*People v. Nelson* (2012) 53 Cal.4th 367, 374-375 (*Nelson*).) "Determining the validity of a *Miranda* rights waiver requires 'an evaluation of the defendant's state of mind' [citation] and 'inquiry into all the circumstances surrounding the interrogation' [citation]." (*Id.* at p. 375.) "When a juvenile's waiver is at issue, consideration must be given to factors such as 'the juvenile's age, experience, education, background, and intelligence, and . . . whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.' [Citation.]" (*Ibid.*)

"A confession is involuntary if an individual's will was overborne. [Citations.] A coerced confession is not 'the product of a rational intellect and a free will.' [Citation.] [¶] In deciding if a defendant's will was overborne, courts examine 'all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.' [Citations.] [¶] Characteristics of the accused which may be examined

include the accused's age, sophistication, prior experience with the criminal justice system and emotional state." (*In re Shawn D.* (1993) 20 Cal.App.4th 200, 208-209.)

" 'It is well settled that a confession is involuntary and therefore inadmissible if it was elicited by any promise of benefit or leniency whether express or implied.' [Citation.]" (*People v. Cahill* (1994) 22 Cal.App.4th 296, 311.) " 'The line to be drawn between permissible police conduct and conduct deemed to induce or to tend to induce an involuntary statement does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth, as represented by the police. . . . [¶] When the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct, we can perceive nothing improper in such police activity. On the other hand, if in addition to the foregoing benefit, or in the place thereof, the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible. The offer or promise of such benefit need not be expressed, but may be implied from equivocal language not otherwise made clear.' [Citations.]" (*Id.* at pp. 311-312.)

The juvenile court's legal conclusion on the issue of voluntariness is subject to our independent review. (*People v. Dykes* (2009) 46 Cal.4th 731.) On the other hand, its "resolution of disputed facts and inferences, its evaluation of credibility, and its findings as to the circumstances surrounding the confession are upheld if supported by substantial evidence." (*Id.* at p. 752.)

B.    *The Circumstances Surrounding the Interrogation Support a Finding of Voluntariness.*

Minor testified that during the ride to the police station, Officer Blaisdell advised him four times that if he was truthful, he could go home. Minor also testified Blaisdell repeated this advice after they arrived at the station. Minor said, "So at that point, I just wanted to go home. I didn't want to be there, so I told him it was an accident." Officer Blaisdell, however, testified he did not question Minor in the patrol car and did not

15

question him at the station until after he had read him his *Miranda* rights in the interview room. As noted earlier, the juvenile court specifically found Minor was not credible and Officer Blaisdell was.

Unlike the cases upon which Minor relies, here, Officer Blaisdell did not promise Minor he would receive more lenient treatment from the prosecution or the courts if he told the truth.[10] The most Blaisdell promised was that the interview could be finished quickly if Minor was truthful. Blaisdell had already told Minor's mother he would bring Minor home after the interview, and he did so. Blaisdell's statement to Minor contains no suggestion that Minor would either not be charged or would be charged with a lesser offense if he confessed. There was no express or implied promise of more lenient treatment. Thus, "the benefit pointed out by the police . . . [was] merely that which flows naturally from a truthful and honest course of conduct[.]" (*People v. Cahill, supra,* 22 Cal.App.4th at p. 312.) To the extent Minor asks us to draw different inferences from Blaisdell's statement from those drawn by the juvenile court, we decline to do so.

Other circumstances support the Minor's confession was voluntary. Minor was 17 years old and had a lengthy history in the juvenile court system. (See *Nelson, supra,* 53 Cal.4th at p. 375 [juvenile's *Miranda* waiver knowing and voluntary considering prior arrests and stay in juvenile hall]; see also *In re Z.A.* (2012) 207 Cal.App.4th 1401, 1421

---

[10] This key factual difference suffices to distinguish the cases Minor cites to support his argument. (See *People v. Vasila* (1995) 38 Cal.App.4th 865, 868-869, 874-877 [confession involuntary where police interrogated defendant who had clearly invoked his right to remain silent, expressly and impliedly promised he would not be federally prosecuted and would be released if he confessed, was threatened with continued detention if he was not forthcoming, and was interrogated despite telling police he was so fatigued he did not trust his judgment]; *In re Shawn D., supra,* 20 Cal.App.4th at pp. 203, 212-216 [unsophisticated, naïve 16-year-old defendant who was suffering from post-traumatic stress disorder did not make voluntary confession where, during three-hour interrogation, police lied and told him he would be prosecuted as an adult, implied his pregnant girlfriend would get in trouble if he failed to confess, misrepresented defendant's potential liability, and promised leniency in exchange for confession]; *In re J. Clyde K.* (1987) 192 Cal.App.3d 710, 720-722 [juvenile's confession coerced where police detained and handcuffed defendants and expressly threatened them with jail if they lied but promised only a citation if they told the truth].)

[minor's *lack* of criminal history a factor in analyzing *Miranda* claim].)  Although Minor characterizes himself as "a young man with ongoing mental health problems,"  he reported to the probation officer that he was "in good health with no history of mental illness" and was taking no medication.[11]  As for the interview itself, it was not a long one. Blaisdell was not threatening or intimidating during it, and the parties stipulated the officer's tone remained conversational throughout the questioning.

More instructive than the cases upon which Minor relies is the opinion in *People v. Holloway* (2004) 33 Cal.4th 96.  The defendant there was a suspect in a murder case and was subjected to "long and vigorous questioning" by two police detectives.  (*Id.* at p. 112.)  When Holloway denied responsibility for the crimes, the detectives "repeatedly accused him of lying, confronted him with evidence contrary to his story" and suggested alternative scenarios for how the homicides may have occurred.  (*Ibid.*)  One of the detectives said, " 'I want you to understand something.  We're talking about a death penalty case here.' "  (*Id.* at p. 113, italics omitted.)  The Supreme Court concluded Holloway's statement was properly admitted.  "[T]he detectives in this case did not cross the line from proper exhortations to tell the truth into impermissible threats of punishment[.]"  (*Id.* at p. 115.)  The questioning to which Minor was subjected was far less harsh than the interrogation approved in *Holloway*.  We therefore conclude the juvenile court did not err in finding Minor's confession voluntary.

V.  *Substantial Evidence Supports the Finding that Minor Was Guilty of Arson.*

Minor claims there was insufficient evidence to sustain the arson charge, because there was insufficient evidence of malice and because the prosecution failed to prove he

---

[11] In support of this claim, Minor's opening brief refers to some mental health issues he had had years earlier.  But the juvenile court was concerned with Minor's characteristics at the time of the interview, not years before.  To the extent this information is relevant at all, we note Minor fails to explain that his providers reported he was complying with his treatment program, had tested negative for drugs and alcohol, and was making good progress in resolving the issues he had.  In addition, Minor introduced no evidence at the hearing that these issues would have impaired his ability to waive his *Miranda* rights and give a voluntary confession.

did not own the land on which the fire occurred.  We find these arguments factually and legally flawed.

A.    *Standard of Review and Elements of the Offense*

Minor's substantial evidence challenge to the judgment sustaining the arson charge "is governed by the same standard applicable to adult criminal cases.  [Citation.] 'In reviewing the sufficiency of the evidence, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  [Citation.]' [Citation.]  ' "[O]ur role on appeal is a limited one."  [Citation.]  Under the substantial evidence rule, we must presume in support of the judgment the existence of every fact that the trier of fact could reasonably have deduced from the evidence.  [Citation.]  Thus, if the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant reversal of the judgment.  [Citation.]' [Citation.]" (*In re V.V.* (2011) 51 Cal.4th 1020, 1026.)

As in any criminal appeal, "we are in no position to weigh any conflicts or disputes in the evidence.  The juvenile trial court was the trier of fact and the sole judge of the credibility of witnesses; we are not.  Even if different inferences can reasonably be drawn from the evidence, we cannot substitute our own inferences or deductions for those of the trial court.  We must consider all of the evidence in the light most favorable to the prevailing party, giving that party the benefit of every reasonable inference from the evidence tending to establish the correctness of the trial court's decision, and resolving conflicts in support of the trial court's decision." (*In re Ryan N., supra,* 92 Cal.App.4th at p. 1373.)  Our review for substantial evidence includes " '*all* of the evidence admitted by the trial court,' *regardless* whether that evidence was admitted erroneously[.] [Citations.]" (*McDaniel v. Brown* (2010) 558 U.S. 120, 131, italics added.)  To warrant reversal of the judgment, " 'it must clearly appear that upon no hypothesis whatever is there sufficient substantial evidence to support it.' [Citation.]" (*In re Ryan N., supra,* 92 Cal.App.4th at p. 1372.)

18

" 'A person is guilty of arson when he or she willfully and maliciously sets fire to or burns or causes to be burned or who aids, counsels, or procures the burning of, any structure, forest land, or property.' (§ 451.) 'Willfully' is defined not in the arson chapter, but in section 7, item 1: 'The word "willfully," when applied to the intent with which an act is done or omitted, implies simply a purpose or willingness to commit the act, or make the omission referred to. It does not require any intent to violate law, or to injure another, or to acquire any advantage.' The arson chapter defines 'maliciously' as involving 'a wish to vex, defraud, annoy, or injure another person, or an intent to do a wrongful act, established either by proof or presumption of law.' (§ 450, subd. (e).) This is the same definition as found in section 7, item 4, except for the inclusion of 'defraud' in section 450." (*In re V.V., supra,* 51 Cal.4th at p. 1027.)

B.      *There Was Sufficient Evidence of the Required Malice.*

Minor contends there is insufficient evidence of the malice required to sustain the arson finding. He argues the evidence in this case indicates his behavior was reckless but not malicious. We disagree with both his understanding of malice and his view of the evidence.

Initially, we concur with the People that Minor's discussion and analysis of the evidence is deficient. Minor focuses almost exclusively on the evidence favorable to him, and in so doing "forfeits consideration of the issue." (*People v. Battle* (2011) 198 Cal.App.4th 50, 62.) An appellant "does not show the evidence is insufficient by citing only his own evidence, or by arguing about what evidence is *not* in the record, or by portraying the evidence that is in the record in the light most favorable to himself." (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.) With such an incomplete discussion of the evidence, Minor cannot affirmatively demonstrate the evidence is insufficient. (See *ibid.*)

Minor's arguments are unmeritorious in any event. He contends there is no evidence of malice because he meant to burn the cardboard, but then "carelessly dropped" it on the hillside to try to put it out. He tells us the resulting fire was an accident. Minor asserts there is nothing in the record to show he acted with " 'a design to

do an intentional wrongful act[.]' " (*People v. Atkins* (2001) 25 Cal.4th 76, 88.)  Minor misapprehends the nature of the malice section 451 requires.

The type of malice at issue here is "malice in law[.]"  (*In re V.V., supra,* 51 Cal.4th at p. 1028.)  This form of malice "is defined in section 7, item 4 as 'an intent to do a wrongful act, established either by proof or presumption of law.'  [Citations.]"  Malice in law "will be presumed or implied from the deliberate and intentional ignition or act of setting a fire without a legal justification, excuse, or claim of right."  (*Ibid*.)  What is required is only "a general intent to willfully commit the act of setting on fire under such circumstances that the direct, natural, and highly probable consequences would be the burning of the relevant structure or property."  (*Id.* at p. 1029.)  Thus, Minor "may be guilty of arson if he . . . act[ed] with awareness of facts that would lead a reasonable person to realize that the direct, natural, and highly probable consequence of igniting and throwing [a piece of cardboard] into dry brush would be the burning of the hillside."  (*Id.* at p. 1030.)

The evidence before the juvenile court supports a finding of malice.  It showed a group of teenagers were in a Toyota Corolla parked in the middle of the road by a hillside covered with dry grass.  One of the car doors was open, as if the boys were waiting for someone.  A young Hispanic man, who looked "really similar" to Minor, was seen running from the hillside and laughing.  (See *In re V.V., supra,* 51 Cal.4th at p. 1031 [fact that minors were laughing after realizing hillside was on fire supported finding of malice].)  Behind him, there was a "lot of smoke."  The area of smoke quickly turned into flames.  The car with the teenagers sped off, and they failed to notify authorities of the fire.  (*Ibid.* [flight from scene of fire and failure to notify authorities supported inference of malice].)  A cigarette lighter and partially burned cardboard were found at the origin of the fire.  When questioned, Minor first lied about whether the Toyota in front of his mother's house had been driven recently.  Later, he admitted he lit cardboard on fire and threw it and the lighter on the ground.  Minor also admitted to the police he intended to light the area on fire, although he did not know the fire would grow so large.  He fled when he realized he could not put it out.  This amply supports a finding that Minor acted

willfully and maliciously within the meaning of section 451. (See *id.* at pp. 1030-1031 [malice shown where minors did not intend to set hillside on fire but were aware of facts that would lead reasonable person to believe that direct, natural, and highly probable consequences of their action would be to cause a fire].)

C.      *The Prosecution Was Not Required to Prove Minor Did Not Own the Burned Area.*

Minor also contends the prosecution was required to prove beyond a reasonable doubt that the area burned did not belong to him. He made this argument in the juvenile court, and there as here he relied on the language of section 451, subdivision (d).[12] He contends section 451's "[e]xplanatory subsections and definitions emphasize that injury to one's own property is not arson." The juvenile court rejected his contention, because that subdivision refers specifically to *personal* property, "[a]nd the Legislature appears to have been very cognizant of the difference between personal and real property." The juvenile court was correct.

As the People point out, Minor was not charged with arson of personal property under subdivision (d) of section 451, but rather with arson of "forest land" under subdivision (c). Section 450 defines the terms used in section 451. "'Forest land' means any brush covered land, cut-over land, forest, grasslands, or woods." (§ 450, subd. (b).) "'Property' means real property or personal property, *other than a structure or forest land.*" (§ 450, subd. (c), italics added.) Section 451, subdivision (d)—the explanatory subsection upon which Minor relies—is expressly limited to the burning of one's own personal property, and the Legislature has specifically distinguished forest land from real or personal property. (§§ 450, subd. (c), 451, subd. (d).) Since Minor was charged with arson of forest land and not personal property, section 451, subdivision (d) has no

---

[12] Section 451, subdivision (d), provides: "Arson of property is a felony punishable by imprisonment in the state prison for 16 months, two, or three years. *For purposes of this paragraph,* arson of property does not include one burning or causing to be burned *his or her own personal property* unless there is an intent to defraud or there is injury to another person or another person's structure, forest land, or property." (Italics added.)

21

application to his case.[13] Consequently, the prosecution was not required to prove the hillside Minor burned did not belong to him, and thus we need not address Minor's arguments about the insufficiency of the evidence of ownership.

VI.    *Minor's Maximum Period of Confinement Must Be Corrected.*

Minor contends, and the People agree, that the juvenile court incorrectly calculated his maximum period of confinement. The court stated Minor's "[m]aximum period of confinement, taking into consideration prior offenses, is 10 years and 10 months." It further stated his remaining custody time was 8 years, 11 months, and 8 days. The parties are in accord that Minor's maximum period of confinement should have been nine years and six months. We agree.

The operative petition listed five prior offenses that could be used to increase the total commitment time: two counts of grand theft (§ 487, subd. (c)), misdemeanor criminal threats (§ 422), attempted grand theft (§§ 664/487, subd. (c)), and second degree burglary (§§ 459/460, subd. (b)).

Under Welfare and Institutions Code section 726, subdivision (d)(1), if the juvenile court order a minor removed from the physical custody of his parent or guardian as a result of an order of wardship under Welfare and Institutions Code section 602, "the order shall specify that the minor may not be held in physical confinement for a period in excess of the maximum term of imprisonment which could be imposed upon an adult convicted of the offense or offenses which brought or continued the minor under the jurisdiction of the juvenile court." Under subdivision (d)(3) of Welfare and Institutions Code, "[i]f the court elects to aggregate the period of physical confinement on multiple counts or multiple petitions, including previously sustained petitions adjudging the minor

---

[13] This suffices to distinguish *In re L.T.* (2002) 103 Cal.App.4th 262, on which Minor relies, from the case before us. That case involved a petition filed under section 451, subdivision (d). (*Id*. at p. 264.) The court held that a prosecution under that subdivision "required proof that the property [the minor] burned did not belong to her." (*Ibid.*) Minor cites no authority holding that similar proof is required to sustain an arson charge under section 451, subdivision (c), and as we have explained in the text, requiring such proof would be inconsistent with the language of sections 450 and 451.

a ward within Section 602, the 'maximum period of imprisonment' shall be the aggregate term of imprisonment specified in subdivision (a) of Section 1170.1 of the Penal Code . . . ."

Here, the juvenile court did not explain on the record how it arrived at the maximum period of confinement. It may have taken the calculation from the probation report, which listed 10 years 10 months as the aggregate custody time. Both parties, however, calculate the terms of imprisonment for Minor's current and prior offenses as follows: The upper term for arson is six years. (§ 451, subd. (c).) One-third of the middle term for the additional current offenses is eight months for the vehicle theft (Veh. Code, § 10851, subd. (a)), and two months for providing false information to a peace officer, a misdemeanor (§ 148.9, subd. (a)). One-third of the middle term for the prior offenses is eight months each for the two grand theft offenses (§ 487, subd. (c)), four months for the misdemeanor criminal threats (§ 422, subd. (a)), four months for the attempted grand theft (§§ 664/487, subd. (c)), and eight months for the second degree burglary (§§ 459/460, subd. (b)). The total maximum period of confinement is nine years, six months.

We may correct the error in the maximum term of confinement on appeal. (E.g., *In re Ricky H.* (1981) 30 Cal.3d 176, 191 [appellate court may correct unauthorized sentence whenever the error comes to court's attention].) We will do so here and will order the judgment modified accordingly.

DISPOSITION

The judgment is modified to reflect a maximum confinement term of nine years, six months. As modified, the judgment is affirmed.

_____

Jones, P.J.


We concur:


_____

Simons, J.


_____

Bruiniers, J.